IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

TAKEEMA HUGHES                                                                                    PLAINTIFF

VS.                                                                      CIVIL ACTION NO. 3:14cv230-DPJ-FKB

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY                                         DEFENDANT

**REPORT AND RECOMMENDATION**

Takeema Hughes brought this action to obtain judicial review of a final decision of the Commissioner of the Social Security Administration.  Presently before the Court are Hughes's motion for summary judgment [14] and the Commissioner's motion to affirm [15]. Having considered the memoranda of the parties and the administrative record, the undersigned recommends that Hughes's motion be denied and that the Commissioner's motion be granted.

**I.  Procedural History**

Takeema Hughes received Supplemental Security Income (SSI) benefits as a child. When she reached the age of 18, the Social Security Administration reviewed her case and determined that benefits should cease.[1]  The determination was upheld upon reconsideration.  She appealed and was granted a hearing before an administrative law judge (ALJ).   The ALJ convened a hearing on April 24, 2012, but continued it in order that Hughes might obtain counsel.  The ALJ reconvened the hearing on September 14, 2012,

---

[1] Once an individual who was received SSI benefits based upon disability as a child reaches the age of 18, the Commissioner is required to redetermine the individual's disability under the rules for disability used for adults.  *See* 20 C.F.R. § 416.987.

at which time Hughes remained unrepresented. The ALJ conducted the hearing on that date and issued a decision finding that Hughes is not disabled. The Appeals Council denied review, thereby making the decision of the ALJ the final decision of the Commissioner. Hughes then brought this appeal pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

Takeema Hughes was born on July 28, 1992. She was placed in special education classes early in school. At the age of ten, Hughes was referred to Life Health Mental Health Center (Life Health) for behavioral problems and disruptive behaviors at home and school. As reported to Life Health, these behaviors included excessive talking, talking very loud, fighting with siblings, screaming, stubbornness, and failure to pay attention. R. 295.[2] Takeema's mother also reported that she had an imaginary friend who told her to do things and that Hughes walked throughout the night and had nightmares. *Id.* Initial impression included an Axis I diagnosis of disruptive behavior disorder, NOS, and an Axis V diagnosis (Global Assessment of Functioning or "GAF") of 65. R. 297. Hughes began individual therapy to work on anger management and social interaction skills. In March of 2003, Hughes was admitted to Brentwood for several days for homicidal ideations towards peers, auditory hallucinations, aggression, and nightmares. R. 285. She was placed on Risperdal. *Id.* Discharge diagnosis was Axis I, oppositional defiant disorder; Axis II, borderline intellectual functioning; and a GAF of 61. R. 285. Thereafter she continued regular therapy at Life Health. The therapy focused on anger management, staying on

---

[2]Citations reflect the original pagination of the administrative record.

task, following instructions, and social interactions. In 2004, she was prescribed Strattera in addition to Risperdal. R. 271.

Regular therapy continued until August of 2006, when Hughes was discharged from Life Health, apparently because she moved out of the service area. She returned three years later in September of 2009 with complaints of being easily angered, nervousness, and low self-esteem. R. 235. Her diagnosis at this time was Axis I, oppositional defiant disorder; Axis II, developmental arithmetic disorder; and Axis V, 65. R. 237.

In October of 2009 Hughes went to her school counselor after a student made a demeaning remark to her. Hughes reported to the counselor that she was having homicidal thoughts as a result of the encounter. R. 233. The therapist requested that she be seen at Life Health on an emergency basis. *Id.* Notes from her visit at Life Health the following day indicate that while she was still angry, she had no homicidal thoughts and no plan. R. 230. She and the therapist discussed anger control and the importance of a positive self-image. *Id.*

Notes from therapy at Life Health over the next several months show that she progressed in her self-confidence, anger management, and self-control. In June of 2010, she was discharged from Life Health, with the therapist stating that she had completed her therapy successfully and had achieved her treatment goals. R. 217-18.

In January of 2012, Hughes returned to Life Health. She reported that she had stopped taking her medication approximately three months earlier and was experiencing a return of insomnia, auditory hallucinations, and mood swings. R. 338. Impression

3

included an Axis I diagnosis of psychotic disorder NOS and a GAF of 60.  R. 341.  Upon return to Life Health two months later, mental status exam was abnormal for constricted affect, paranoid thought content, auditory hallucinations, poor concentration, impaired attention span, impaired recent memory, and below average intelligence.  R. 333-34.  Hughes was prescribed Abilify.  R. 34.  Her diagnosis was Axis I, psychotic disorder, NOS; Axis III, Obesity; Axis IV, severe teasing at school and no friends; and Axis V, 50.  R. 334.

Dr. Joseph Dunn performed a consultative psychological examination of Hughes on October 11, 2012.  He observed that Hughes was uncooperative and put forth very little effort during the exam.  R. 347.  Dr. Dunn attempted to administer the WAIS-IV but discontinued after she achieved raw scores of zero on the first six subtests.  R. 349.  He also administered the Wide Range Achievement Test-Four but stated that these results likewise appeared invalid, as Hughes identified only one letter and one word on the entire test.  *Id.*  Dr. Dunn opined that while Hughes may have significant and even substantial limitations and may be functioning in the mildly mentally retarded range, this could not be concluded from testing.  R. 349.

The record contains a special education assessment from Hughes's school dated October 16, 2008.  At this time, Hughes was 16 years of age and in the tenth grade.  The assessment states that Hughes was reading at the 4.3 grade level.  R. 213.[3]

---

[3]These are the only school records included in the administrative record.  Plaintiff attached additional school records to her brief.  Because these records are not a part of the record, they have not been considered by the undersigned.  *See Flores v. Heckler*, 755 F. 2d 401, 403 (5th Cir. 1985).  In any event, the records contain nothing that would change the undersigned's conclusions.

At the hearing, Hughes testified that she spends most of her time watching television. R. 34. She has no outside activities, performs no chores, and has no friends because she cannot get along with people. R. 35-36. She gets along with her siblings "okay." R. 35. She cannot drive. R. 32. She is nervous all of the time and hears voices sometimes; the voices tell her to fight people. R. 33-34, 36. She takes medication for nerves and hearing voices, and she goes to therapy at Life Health every two weeks. R. 32-33.

Hughes's mother also testified at the hearing. She stated that her daughter completed high school and received a special education diploma. R. 37. She spends her time at home watching television, playing games on her phone, playing with dolls, and playing with her siblings. *Id.* She has no friends. R. 38. She can attend to her personal needs. R. 41. Prior to Takeema's admission to Brentwood, she was fighting at school and threatened her siblings with a knife, necessitating that her mother call the police. R. 39. During her last year of school, Takeema pulled a knife on a student. R. 40-41. Ms. Hughes stated that her daughter "likes to fight." R. 42.

### III. The Decision of the ALJ and Analysis

In his decision, the ALJ worked through the familiar sequential evaluation process for determining disability.[4] He found that Hughes has the severe impairments of obesity,

---

[4]In evaluating a disability claim, the ALJ is to engage in a five-step sequential process, making the following determinations:

(1)    whether the claimant is presently engaging in substantial gainful activity (if so, a finding of "not disabled" is made);

(2)    whether the claimant has a severe impairment (if not, a finding of "not

5

a history of personality disorder, and borderline intellectual functioning. R. 15-16. At step three, the ALJ determined that Hughes does not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16-18. The ALJ found that Hughes has the residual functional capacity to perform light work as defined by 20 C.F.R. § 416.967(b), with the following limitations: She can only occasionally stoop, kneel, crouch, climb and crawl, she can understand, remember, and carry out only simple instructions, she can maintain attention for two-hour intervals, she cannot work at jobs requiring intense concentration, attention, and focus throughout the work day, she cannot work with the general public, and she can work only at jobs that require no more than occasional interaction with coworkers and supervisors. R. 18. At the final step of the analysis, the ALJ, relying upon the testimony of the VE, determined that Hughes can perform the jobs of laundry presser, poultry eviscerator, and assembler-small parts, and that these jobs exist in significant numbers.

---

disabled" is made);

(3) whether the impairment is listed, or equivalent to an impairment listed, in 20 C.F.R. Part 404, Subpart P, Appendix 1 (if so, then the claimant is found to be disabled);

(4) whether the impairment prevents the claimant from doing past relevant work (if not, the claimant is found to be not disabled); and

(5) whether the impairment prevents the claimant from performing any other substantial gainful activity (if so, the claimant is found to be disabled).

*See* 20 C.F.R. §§ 404.1520, 416.920. The analysis ends at the point at which a finding of disability or non-disability is required. The burden to prove disability rests upon the claimant throughout the first four steps; if the claimant is successful in sustaining her burden through step four, the burden then shifts to the Commissioner at step five. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

R. 21. The ALJ therefore determined that Hughes's disability ended on February 8, 2011, and that she has not become disabled again since that date. *Id.*

In reviewing the Commissioner's decision, this court is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).[5] In her memoranda, Hughes makes five arguments, which are analyzed below.

*1. The ALJ erred in failing to find disability at step three.* Hughes contends that ALJ erred in failing to find that her mental impairments meet or equal in severity listings 12.03, 12.05, and/or 12.08. Listing 12.03 sets out the criteria for schizophrenic, paranoid, and other psychotic disorders; listing 12.08 describes personality disorders. Although Plaintiff states that the ALJ should have found her impairments meet or equal these listings, she makes no real argument directed to the specific severity requirements set forth in each. The undersigned has examined the requirements for each of these and concludes that there is nothing in the record to support a finding that Hughes's impairments meet or equal in severity these listings.

---

[5] "To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a scintilla but it need not be a preponderance. . . ." *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989) (quoting *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987)). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed, *Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)), even if the court finds that the preponderance of the evidence is *against* the Commissioner's decision, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

The ALJ carefully considered whether Hughes meets the listing for mental retardation, listing 12.05.[6] Listing 12.05 consists an introductory paragraph, or "capsule definition," setting forth the diagnostic criteria for mental retardation, and four "severity prongs" (paragraphs A through D). In order to satisfy the listing, a social security claimant must meet both the capsule definition and one of the four severity prongs. *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009). The ALJ found that Hughes does not meet the requirements of paragraph A.[7] The undersigned concludes this finding is supported by substantial evidence. Hughes completed the twelfth grade in special education, and her school records indicate that she can read and write. Her mother testified that she can attend to her personal needs. Furthermore, her treatment records from Life Health and her testimony at the hearing indicate that she has no difficulties with communication. As to the B and C criteria, the ALJ correctly determined that Hughes did not meet them because she does not have valid IQ testing results in the required ranges.[8] The ALJ also considered whether Hughes meets the paragraph D criteria and determined that she did not, as she has only moderate difficulties in the areas listed and has had no episodes of

---

[6]At the time of the ALJ's decision, the term used in listing 12.05 was "mental retardation." After the decision, the term was changed to "intellectual disability." The substantive criteria for the listing, however, did not change.

[7]The A requirements are "[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded."

[8]Paragraph B requires a "valid verbal, performance, or full scale IQ of 59 or less." Paragraph C requires an IQ of 60 through 70 along with "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

decompensation.[9]  He did not specifically rely upon the lack of a valid IQ score of 60 through 70.

Plaintiff's remaining argument along these lines is based upon portions of SSR 85-15 and SSR 96-p.  SSR 85-15, 1985 WL 56857, addresses the use of the "grids" as a framework in cases involving solely nonexertional impairments, *i.e.*, mental illness.  It points out that in order to perform any work, even unskilled sedentary work, an individual must be able "[t]o understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  *Id.* at *4.  It goes on to state that "[a] substantial loss of the ability to meet any of these base work-related activities would severely limit the potential occupational base" and would justify a finding of disability.  *Id.*  SSR 96-9p, 1996 WL 374185, contains a nearly identical statement.  *Id.* at *9.  Hughes's argument appears to be that because the ALJ limited Hughes to only occasional interactions with the public, coworkers, and supervisors, he necessarily found that Hughes has suffered a "substantial loss" of some of these abilities and, therefore, he should have found that she is disabled.

---

[9]The D requirements are an IQ of 60 through 70 resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

The undersigned rejects Hughes's logic. The ALJ gave weight to the state consultant's opinion that Hughes was only moderately limited in the work-related areas identified in the rulings, and the opinion is consistent with the restrictions identified by the ALJ. There is simply no basis for equating these moderate limitations with a substantial loss of work-related abilities such that a finding of disability would be mandated.

*2. The ALJ erred by failing to fulfill his duty to develop the record.* An ALJ has a duty to develop the record so that he has sufficient facts upon which to make a decision. *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). This duty is heightened where the claimant is unrepresented. *Id.*

Hughes argues that the ALJ failed to fulfill his duty in the present case. Although making this argument, Hughes does not state with any specificity what else the ALJ should or could have done to develop the record. Admittedly, it is troubling that the record does not contain the results of valid IQ testing. But this omission is not the fault of the ALJ, who after the hearing sent Hughes for a comprehensive mental status examination that included IQ and achievement testing. The results were, however, considered invalid because of Hughes's failure to put forth effort during the exam.

Furthermore, a claimant seeking reversal based upon the failure of the ALJ to develop an adequate record must show that had he fulfilled his duty, evidence would have been adduced that might have altered the result. *Kane*, 731 F.2d at 1210. Hughes has failed to make the necessary showing. This allegation of error is without merit.

*3. The ALJ erred in failing to inform Hughes of her right to representation and in failing to obtain from her a written waiver of representation.* A social security claimant is

10

entitled to representation at a hearing before an ALJ and is entitled to adequate notice of this right. 42 U.S.C. § 406; 20 C.F.R. § 416.1506. Hughes contends that she is entitled to reversal because the ALJ failed to inform her of her right to representation. The premise of this argument is patently false. At least twice prior to the hearing, Hughes received notice of her right to representation. R. 86-89, 96-97. At the first setting of the hearing, the ALJ discussed Hughes's right to representation and even recommended a particular representative. R. 52-53. He continued the hearing to give her an opportunity to obtain representation, warning her that the hearing would not be continued again, R. 53-54, and she signed a letter indicating her understanding of her right to representation and her obligation to seek representation, if she desired it, prior to the new hearing date, R. 105. Hughes failed to obtain representation during the nearly five months prior to the new hearing date, and the hearing went forward the second time it was convened.

Hughes's real point appears to be that the ALJ addressed her mother, rather than herself, during the discussions regarding counsel. It is true that when the hearing was convened the first time, Hughes's mother, not Hughes, was the one who talked with the ALJ and responded to his questions. But the transcript indicates that Hughes was present and that the ALJ addressed Hughes as well as her mother (designated as "Witness" in the transcript):

> ALJ:   The claimant is here today, not represented, but she is accompanied by her mother. Ma'am, you're not required to have a representative, but it is my duty to explain to you that you do have that right, the privilege at least. And if you so desire, I'll postpone this hearing until you get a representative. My question to you is what do you all want to do? Do you want to get a representative, do you want to postpone it to see if you can find a representative, or do you want to go forward with this hearing today?

11

> WITNESS:    Can I ask –
>
> ALJ:        All right.
>
> WITNESS    Okay.  But she already draws – haven't I been paid –
>
> ALJ:        I've got nothing to do with that.  This is – you all were awarded benefits?
>
> WITNESS:    Yes, she already draws.
>
> ALJ:        Okay.  Does she still continue to draw?
>
> WITNESS:    Yes, she still continues.
>
> ALJ:        Okay.  There are some agencies like Legal Services that will – that represent people free.  There may be other some other agencies besides Legal Services.  There's people in this area that might – where do you live at?
>
> WITNESS:    (Inaudible).

R. 52-53.  The ALJ went on to suggest a particular representative and explained the contingency fee system for social security cases.  He then addressed both Hughes and her mother:

> ALJ:        . . . So what do you all want to do?
>
> WITNESS:    I think we're just going to try to get a representative.  (INAUDIBLE).
>
> ALJ:        Okay.  All right now, I want you to understand, and this is not to frighten you or anything, I'm just putting you on notice, the next time you're not going to postpone the hearing so you can get a representative.  This is your opportunity to get the case postponed so you can get a representative.  But next time we're going to have to have the hearing whether you have a representative or not.  But you're entitled to have it postponed now so you can seek – get a representative, okay?
>
> WITNESS:    Okay.

  ALJ:  All right, we'll postpone it so you can get a representative. Thank you.

R. 53-54. When the hearing was convened the second time, the ALJ asked Hughes whether she had a representative. R. 29. She responded in the negative and affirmed that the ALJ had made it clear previously that this time the hearing would go forward, whether or not she had a representative. *Id.* The undersigned concludes that there was no error and that the ALJ clearly informed Hughes of her right to representation.

  Next, Hughes argues that the ALJ erred in failing to obtain a written waiver of representation in accordance with the Hearings, Appeals and Litigation and Law Manual (HALLEX). This omission on the part of the ALJ does not warrant relief. In order for a HALLEX violation to serve as the basis for reversal, the claimant must establish prejudice as a result of the violation. See *Shave v. Apfel*, 238 F.3d 592, 596-97 (5th Cir. 2001). The undersigned has already concluded that Hughes was clearly informed of her right to counsel. Furthermore, she cannot establish that the result of the hearing might have been different had she been presented with a written waiver for her signature.

  *4. The ALJ erred in failing to properly assess Hughes's credibility.* The ALJ determined that Hughes's limitations were not as severe as she claimed. In her brief, Hughes argues that the ALJ merely used boilerplate language and failed to make an adequate assessment of Hughes's credibility. Where the uncontroverted medical evidence indicates a basis for a claimant's subjective complaints, the ALJ must weigh the objective medical evidence and assign articulated reasons for discrediting the claimant's complaints. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988) (per curiam). Furthermore, SSR 96-7p provides that where a medically determinable impairment could

reasonably be expected to produce the symptoms alleged by the claimant, the ALJ must do more than make conclusory statements regarding credibility: He must explain in his opinion the specific reasons for his finding. SSR 96-7p, 1996 WL 374186 at *2.

Certainly, in the present case the ALJ's opinion contains oft-used language concerning an ALJ's duty to assess credibility. But it contains much more. The ALJ devoted a detailed paragraph to specifying the evidence of record that led him to find that Hughes's allegations were not entirely credible. He pointed out that discharge notes from Life Health in 2010 indicated that she had achieved all of her treatment goals, that she had received only limited mental health treatment since turning 18, the lack of any evidence corroborating the mother's claims of altercations in high school, that there were no records supporting Hughes's testimony that at the time of the hearing she was undergoing therapy every two weeks, and Dr. Dunn's indications that she malingered on her examination. R. 19. The undersigned concludes that the ALJ fulfilled his duty to carefully analyze Hughes's credibility and explain his reasoning.

*5. The decision is not supported by substantial evidence.* Hughes contends that the ALJ's determination is not supported by substantial evidence. Her only specific argument in this regard, however, other than those already analyzed above, is that the DDS contract reviewer, whose opinion the ALJ gave "some weight," "simply completed the check-off forms" without explanation or support. Dr. Scates reviewed the evidence and filled out the forms in the same manner as is done in countless other social security cases. In rendering her opinion as to Hughes's limitations, Dr. Scates had before her the many treatment notes from Hughes's regular, long-term therapy at Life Health. Those

notes indicate treatment primarily for oppositional defiant disorder and issues involving anger, self-control, staying on task, and self-esteem, not psychosis or a more serious mental illness. The ALJ did not err in giving weight to Dr. Scales's opinion.

Furthermore, the undersigned has carefully reviewed the entire administrative record and concludes that the ALJ's decision was supported by substantial evidence.

## IV. Conclusion

The ALJ committed no reversible errors of law, and his decision is supported by substantial evidence. Accordingly, the undersigned recommends that Plaintiff's motion be denied, that Defendant's motion be granted, and that the decision of the Commissioner be affirmed. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court. 28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 25th day of June, 2015.

                                        /s/ F. Keith Ball
                                        UNITED STATES MAGISTRATE JUDGE